LEOON MISZOIAN, administrator, *vs.* L. HERBERT TAFT & another.

SAME *vs.* SAME.

Norfolk.   March 8, 1910. — June 24, 1910.

Present: KNOWLTON, C. J., MORTON, LORING, BRALEY, & RUGG, JJ.

*Negligence,* Employer's liability.

In an action by an administrator, to recover for the conscious suffering and death of the plaintiff's intestate while employed in the dyeing room of a mill of the defendant, it appeared that the intestate was twenty-one years of age and was " quick to learn," and that his injuries and death were caused by the slipping of one of two planks laid across the top of a vat of boiling dye water, on which the intestate was standing for the purpose of pitching wool from a rack to a truck, after it had been taken from the vat and thrown upon the rack in order that the

dye water might drain off from it. A fellow workman of the intestate, who was standing on the rack helping the intestate to throw the wool from the rack to the truck, testified that at the time that the intestate was throwing the wool upon the truck "the boards moved back and forth," that one of them "slipped from the edge of the tank and fell right in," and that the intestate "fell in himself." It appeared that the board which fell in had been placed in position by the plaintiff's intestate and that the end which fell was the end next the rough outer wall of the building. Along this wall ran a two-inch pipe to let boiling water into the vat, and it could have been found, that the space between the pipe and the inner edge of the vat, which was all the space that the end of the plank had to rest on, was only three and a half inches or perhaps only two inches, that this edge of the vat had become somewhat worn and rounded from the planks being placed on it and pulled off and that it was wet and slippery from the oily water of the vat. The planks were six feet nine inches long, eleven inches wide and two inches thick, and were plain boards without cleats. The vat had been there for twelve years, the planks for four years and the pipe for one year before the accident, which was but three weeks after the plaintiff's intestate entered the defendant's employ. *Held*, that, assuming that there was evidence of due care on the part of the plaintiff's intestate, which was doubted, there was no evidence of negligence on the part of the defendant.

Two ACTIONS OF TORT, by the administrator of the estate of Panos Kivorkian, the first action under the employers' liability act for the conscious suffering and death of the plaintiff's intestate on June 17, 1904, while he was employed in the dyeing room of the defendants' mill in that part of the town of Bellingham called Careyville, alleged to have been caused by a defect in the ways, works or machinery of the defendants, and by the negligence of a superintendent, and the second action at common law for personal injuries alleged to have been sustained by the plaintiff's intestate by reason of defective appliances of the defendants. Writs dated March 16, 1905.

In the Superior Court the cases were tried together before *Hardy*, J., who in each of the actions ordered a verdict for the defendants. The plaintiff alleged exceptions. The facts shown by the evidence are stated in the opinion.

*Asa P. French, (J. S. Allen, Jr., & C. W. Spencer* with him,) for the plaintiff.

*C. F. Spear*, for the defendants.

LORING, J. At the time of the accident the deceased was engaged in pitching wool from a rack on to a truck. The wool in question had been in a vat of boiling dye water and was being thrown on to a rack which was above one end of the vat (as we understand the bill of exceptions) in order that the dye

water with which it was saturated might drain off. To pitch the wool from the rack on to the truck, the deceased on the day in question stood on two planks laid across the vat, and his companion stood on the rack. The companion of the deceased testified on direct examination: " There was a wall against the back of the rack and there was a wall on one side of the rack, and I used to face towards the back wall to which the rack was attached and we would throw the wool from the rack on to the truck. On that day I was standing there on that rack. He, Panos, was on the boards and we were throwing wool from the rack to the truck, and at the time he was throwing the wool on to the trucks, the boards moved back and forth and slipped from the edge of the tank and fell right in, and he fell in himself. He fell straight into it and he was standing in the vat. Only one board fell in." It appeared that the board which fell in had been placed in position by the deceased and the end which fell was the end next to the wall.

On cross-examination the witness testified: " I was pitching wool from the time I began to pitch until the accident happened about five minutes. The first time we entered the rack and started to work was the time I saw how he was standing. Before I had another chance to turn around and look at him he was in the water in the tank. Just as soon as the plank had fallen into the water he fell in with it." Another of the plaintiff's witnesses who was present testified: " I did not see him fall into the vat. The last time I saw him was three or four minutes before he fell into the water," and the only other witness who was present testified: " That he did not see Kivorkian at the time he fell in ; that the last time he saw him was about five minutes before and at that time they were putting a board to get on top and throw the wool off."

It appeared that the vat in question was set up in a corner of a room and the side of the vat from which the plank fell was next the outer wall of the factory. It was set out from this wall some four inches because of the unevenness of the wall, which was of rough stone. The vat was made of soft two by four pine planks set flat. Along this side wall of the factory a two-inch pipe was run to let boiling water into the vat. The plaintiff's evidence warranted a finding that there was but three and a half

inches or the space of four fingers between this pipe and the inner edge of the vat to rest the planks on.

In addition to that one witness testified that: "There were about two inches between the pipe and the inside edge of the tub [vat], but I guess at that. I never measured it." If this warranted a finding that there was but two inches at this place, the result is not changed.

The plaintiff's evidence also tended to show that this edge of the vat had become somewhat worn and rounded by the planks being placed on it and pulled off, and that it was wet and slippery from the oily water of the vat.

The plaintiff also has contended that the evidence warranted a finding that this edge of the vat had become rounded from the men "poling" the wool, that is to say, by the side of the vat being used as a fulcrum for the handle of the fork in raising the wet wool from the bottom of the tank. But this manifestly did not apply to the side of the vat here in question and in each instance where this testimony was given it was confined to the "other" sides of the vat.

The planks on which Kivorkian stood were of chestnut, six feet nine inches long, eleven inches wide and two inches thick, plain boards without cleats.

It may well be doubted whether there was any evidence of due care on the part of the plaintiff. All the witnesses who were present testified in terms that they did not see what the deceased was doing at the time of the accident. His companion so testified on cross-examination. If what was testified to by him on cross-examination is not to be taken to control what he testified to on his direct examination, the result might well be thought to be the same. On direct examination this witness said that as the deceased was throwing the wool "the boards moved back and forth." This would seem to imply that he was standing and throwing his weight in such a way while reaching out with his fork as to cause the plank to slip.

But however this may be, it is plain that there was no evidence of negligence on the part of the defendants.

It is admitted that the vat had been there twelve years, the planks four years and the pipe one year before the accident, which was but three weeks after the plaintiff entered the de-

fendants' employ. It is apparent that the physical conditions relied on here had not changed after the plaintiff entered the defendants' employ. It is also apparent that the dangers incident to those conditions were obvious to and must have been appreciated by an ordinary man of full age using reasonable care, and the deceased was twenty-one years of age and " quick to learn."

It is doubtless true that it would have been safer if there had been a cleat under the planks inside the inside edge of the outer side of the vat (that is to say the side of the vat away from the outside wall) to keep the planks from slipping off as the plank here in question slipped off. But it has long been settled that no duty rests on an employer to make his factory and the instrumentalities furnished by him to his workmen better than they were when the employee chose to accept work in the factory as it was and with the instrumentalities for work as they were then. *McCafferty* v. *Lewando's Dyeing & Cleansing Co.* 194 Mass. 412. For cases resembling the case at bar in regard to the physical conditions, see *Elvey* v. *Powers,* 191 Mass. 588; *McDonald* v. *Lovell,* 196 Mass. 583.

The exception taken to the ruling on the evidence not having been argued must be taken to have been waived.

*Exceptions overruled.*